**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------

SHELDON MILLER,
on behalf of himself and all others similarly situated,

        Plaintiff,

     -v.-

CALAMOS GLOBAL DYNAMIC INCOME
FUND, WACHOVIA CAPITAL MARKETS
LLC, and CITIGROUP GLOBAL MARKETS,
INC.,

        Defendants.

------------------------------------------------------------

ECF CASE

Case No. 08 C 3756 (AKH) (THK)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANT**
**CALAMOS GLOBAL DYNAMIC INCOME FUND TO DISMISS THE COMPLAINT**

**BELL, BOYD & LLOYD LLP**
John W. Rotunno
Kenneth E. Rechtoris
Jeffrey T. Petersen
70 West Madison Street, Suite 3100
Chicago, Illinois 60602
Phone: (312) 372-1121
Fax: (312) 827-8000
Email: jrotunno@bellboyd.com
       krechtoris@bellboyd.com
       jpetersen@bellboyd.com

**SCHULTE ROTH & ZABEL LLP**
Robert J. Ward
919 Third Avenue
New York, New York 10022
Phone: (212) 756-2000
Fax: (212) 593-5955
Email: robert.ward@srz.com

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................1

PROCEDURAL BACKGROUND........................................................................2

THE ALLEGATIONS OF THE COMPLAINT...................................................4

      A.     The ARPS Offering.................................................................4

      B.    Plaintiff's Claims ..................................................................6

ARGUMENT ........................................................................................................8

I.    Standards Governing the Fund's Rule 12(b)(6) Motion to Dismiss ........................8

II.    Plaintiff's Allegations Concerning the Auction Process Fail to State a Claim Under Section 11 or Section 12(2)(a) of the 1933 Act ...............................11

      A.    The Disclosures in the Registration Statement and Prospectus Negate the Allegations of the Complaint and "Bespeak Caution" Regarding the Risk and Consequences of Auction Failure .......................13

      B.    The Registration Statement and Prospectus Are Replete With Disclosures and Cautionary Statements Regarding the Risk of Auction Failure and the Consequences of Such a Failure .........................15

            1.    Disclosures Concerning the Risk of Auction Failure ...................16

            2.    Disclosures Concerning the Consequences of Auction Failures...........................................................................19

III.    The Fund Had No Duty to Compare ARPS to Other Investment Options ...........22

IV.    Plaintiff Lacks Standing to Assert A Claim Under Section 12(a)(2)....................26

CONCLUSION.....................................................................................................27

TABLE OF AUTHORITIES

Page(s)

CASES

ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ............................... 9

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)....................... 8, 9, 12, 16

Benzon v. Morgan Stanley, 420 F.3d 598 (6th Cir. 2005)............................................................ 25

Conley v. Gibson, 355 U.S. 41 (1957).......................................................................................... 8

Demaria v. Andersen, 153 F. Supp. 2d 300 (S.D.N.Y. 2001) ...................................................... 13

Gotham Holdings, L.P. v. Health Grades, Inc., 534 F.Supp. 2d 442 (S.D.N.Y.
     2008) ................................................................................................................................... 9

Grand Lodge of Pa. v. Peters, 550 F. Supp. 2d 1363 (M.D. Fla. 2008).................................... 9, 27

Gustafson v. Alloyd Co., Inc., 513 U.S. 561 (1995)..................................................................... 26

Harrison v. Rubenstein, 2007 U.S. Dist. LEXIS 13118 (S.D.N.Y. Feb. 23, 2007)...................... 11

Havsy v. Just Toys, Inc., 1994 U.S. Dist. LEXIS 9882 (S.D.N.Y. July 20, 1994)...................... 14

Hinerfeld v. United Auto Grp., 1998 U.S. Dist. LEXIS 10601 (S.D.N.Y. July 15,
     1998) ................................................................................................................................. 13

I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759 (2d
     Cir. 1991) ........................................................................................................................... 4

In re AXIS Capital Holdings Ltd. Sec. Litig., 456 F. Supp. 2d 576 (S.D.N.Y.
     2006) ............................................................................................................................. 9, 10

In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580 (S.D.N.Y. 2005) ........................................ 26, 27

In re Elan Corp. Sec. Litig., No. 02 Civ. 865, 2004 U.S. Dist. LEXIS 9913
     (S.D.N.Y. May 18, 2004)................................................................................................... 10

In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................. 9, 10

In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig., 434 F. Supp. 2d 233 (S.D.N.Y.
     2006) ......................................................................................................................... 9, 10, 23

In re Progress Energy, Inc., 371 F. Supp. 2d 548 (S.D.N.Y. 2005)............................................. 26

In re Trump Casino Sec. Litig., 7 F.3d at 357 (3d Cir. 1993)...................................................... 24

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) ............................................................................... 8

J & R Marketing, SEP v. General Motors Corp., 519 F. 3d 552 (6th Cir. 2008) ......................... 23

Luce v. Edelstein, 802 F. 2d 49 (2d Cir. 1986)........................................................................... 14

Page(s)

Mills v. Polar Molecular Corp., 12 F.3d 1170 (2d Cir. 1993) ...................................................... 10

Nelson v. Nielsen Media Research, Inc., 207 F. Supp. 2d 300 (S.D.N.Y. 2002) ........................... 8

P. Stolz Family P'ship L.P. v. Daum, 355 F. 3d 92 (2d Cir. 2004) ................................... 13, 14, 15

Pew v. Cardarelli, 2005 U.S. Dist. LEXIS 40018 (N.D.N.Y. March 17, 2005) ........................... 13

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)............................................................................ 9

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000)........................................................................... 11

Saslaw v. Al Askari, 1997 U.S. Dist. LEXIS 5621 (S.D.N.Y., April 23, 1997) ................... 26, 27

Sedighim v. Donaldson, Lufkin & Jenrette, Inc., 167 F. Supp. 2d 639 (S.D.N.Y.

    2001) ....................................................................................................................................... 13

Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd., 383 F. Supp. 2d

    428 (S.D.N.Y. 2003)............................................................................................................... 14

Thomas v. Westchester County Health Care Corp., 232 F. Supp. 2d 273

    (S.D.N.Y. 2002) ..................................................................................................................... 11

## STATUTES AND RULES

15 U.S.C. § 77k........................................................................................................... 1, 2, 16

15 U.S.C. § 77k (e) .......................................................................................................... 27

15 U.S.C. § 77l.......................................................................................................... 1, 2, 26

15 U.S.C. § 77z-1............................................................................................................. 3

Rule 12(b)(6), Federal Rules of Civil Procedure ........................................................... 8

Rule 9(b), Federal Rules of Civil Procedure................................................... 8, 9, 10, 16

Defendant Calamos Global Dynamic Income Fund (the "Fund") respectfully submits this Memorandum in support of its Motion to Dismiss the Complaint filed by plaintiff Sheldon Miller ("Plaintiff") for failure to state a claim under either Section 11 (15 U.S.C. § 77k) or Section 12(a)(2) (15 U.S.C. § 77l(a)(2)) of the Securities Act of 1933.

## PRELIMINARY STATEMENT

The Complaint in this action alleges that the defendants made false statements in, and omitted material information from, a Form N-2/A Registration Statement and Prospectus issued in connection with the Fund's September 2007 offering of auction rate cumulative preferred shares ("ARPS"). (Compl. ¶ 1)[1]  Under market conditions as they existed prior to February 2008, ARPS were purchased and sold by investors, and dividend rates on the ARPS were set and reset, through an auction process conducted by broker-dealers. (*Id.* ¶ 5)  Beginning in February 2008, auctions for ARPS (and for other auction rate securities) began to fail. (*Id.* ¶ 6)  As a result, holders of ARPS were unable to sell their shares at auction, and the failure of the auction process triggered what the Complaint refers to as "default interest [sic - "dividend"] rates" on the ARPS which allegedly were less than interest rates paid upon the failure of auctions for "certain competing municipal auction rate securities ('MARS') offered...by municipal issuers…." (*Id.* ¶ 7(b))  Plaintiff contends, in summary, that the Registration Statement and Prospectus filed in connection with the ARPS offering failed to disclose the "true risk" of auction failure and the consequences of such a failure, and that in certain respects ARPS ostensibly were not as good an investment as the unidentified municipal auction rate securities referenced above.

---

[1]    A true and correct copy of the Form N-2/A Registration Statement (excluding exhibits) is attached as Exhibit A to the accompanying Affirmation of Robert J. Ward.  A true and correct copy of the Prospectus is attached as Exhibit B to the Ward Affirmation.

The Complaint fails to state a cause of action against the Fund for several reasons. First, the Fund can have no liability for any purported misstatements concerning the risk of auction failure or the consequences of such a failure because, on the face of the Complaint and the very documents on which Plaintiff's claims supposedly are based, the precise risks that Plaintiff claims were concealed were disclosed and examined in detail.

Second, even if there were adequate factual allegations supporting Plaintiff's claim that ARPS ostensibly were subject to certain disadvantages as compared to municipal auction rate securities, a claim for failure to make such a comparison fails as a matter of law since an issuer has no duty to provide investment advice in a registration statement or prospectus, *i.e.*, to inform prospective investors that the securities in question might not be as advantageous as other investment alternatives in some circumstances.

Third, it appears from a certification attached to the Complaint that Plaintiff purchased a single ARPS unit in December 2007, well after the initial ARPS offering, and Plaintiff therefore lacks standing to assert a claim under Section 12(a)(2).

Consequently, the Complaint must be dismissed in its entirety.

## PROCEDURAL BACKGROUND

The Complaint in this case was filed on April 21, 2008. It is pleaded in two Counts. Count I purports to assert a claim under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, for allegedly false and misleading statements in a Form N-2/A Registration Statement which was filed with the Securities and Exchange Commission on September 12, 2007 in connection with the Fund's issuance of the ARPS (the "Registration Statement"). (Compl. ¶ 23; Count I) Count II purports to assert a claim under Section 12(a)(2) of the 1933 Act, 15 U.S.C. § 77l (a)(2), for allegedly false and misleading statements in a Prospectus filed September 17, 2007 and incorporated in the Registration Statement (the "Prospectus"). (Compl. ¶ 23; Count

II)  The Complaint names as defendants the Fund and two underwriters for the ARPS offering, Wachovia Capital Markets LLC and Citigroup Global Markets Inc.  (Compl. ¶¶ 11; 12; 13) Each defendant is named in both Counts.  The Complaint seeks compensatory damages, rescission under Section 12(b) of the Securities Act of 1933, and unspecified "equitable/injunctive or other relief...."  (Compl., Prayer for Relief)

On May 22, 2008, the parties entered into a Stipulation and Order excusing the Defendants from any obligation to answer or otherwise respond to the Complaint.[2]  The May 22, 2008 stipulation (signed by the Court on May 23), also afforded Plaintiff the opportunity to file an amended complaint 60 days after the entry of an order pursuant to the Private Securities Litigation Reform Act (the "PSLRA") appointing a lead plaintiff, and granted defendants 60 days thereafter within which to move, answer or otherwise respond to such an amended complaint.  Since that time, no motion for the appointment of a lead plaintiff has been filed by the named plaintiff, Sheldon Miller, or by any other ARPS investor, nor has the named plaintiff sought to file an amended complaint.[3]  Furthermore, no ARPS investor other than Sheldon Miller has filed a complaint against the Fund in connection with the Fund's ARPS offering.

---

[2]    Although the Stipulation and Order excused the Defendants from any obligation to answer or otherwise respond to the Complaint filed on April 21, 2008, it in no way prohibited the Defendants from moving or otherwise responding to that Complaint.  The Fund has filed its motion to dismiss at this time as a result of the Plaintiff's failure either to voluntarily dismiss the case or to seek appointment as lead plaintiff and file an amended pleading.

[3]    Pursuant to the PSLRA, any member of a putative class may seek appointment to serve as lead plaintiff on motion filed "not later than 60 days" after publication of a notice advising members of the putative class of, *inter alia,* the pendency of the action. 15 U.S.C. § 77z-1(a)(3)(A)(II).  In this case, as appears from Exhibit C to the accompanying Affirmation of Robert J. Ward, notice of the filing of this action appeared in a release published on the evening of April 21, 2008 in the *Business Wire*.  The 60-day period for the filing of lead plaintiff motions therefore expired no later than June 23, 2008.

## THE ALLEGATIONS OF THE COMPLAINT

**A.    The ARPS Offering.**

Calamos Global Dynamic Income Fund is a closed-end management investment company headquartered in Naperville, Illinois, and registered under the Investment Company Act of 1940. (Compl. ¶¶ 2; 11; 22)[4]

The Complaint alleges that on September 12, 2007, the Fund filed a Form N/2-A Registration Statement for the ARPS offering and thereafter filed the definitive Prospectus for the offering which, when filed, formed part of the Registration Statement. (Compl. ¶ 23) A total of 14,000 preferred shares in five series were issued at a price of $25,000 per share. (Compl. ¶¶ 3; 23)  The Registration Statement and Prospectus are cited in, and are integral to, the Complaint, and therefore may be considered on defendant's Motion to Dismiss.  *See* the discussion *infra*, at pp. 10-11.[5]

---

[4]    A closed-end investment company has a fixed number of outstanding shares.  Closed-end funds are not obligated to redeem shares purchased by investors, unlike "open-end" funds which typically are obligated to redeem shares at net asset value per share.  I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 760 (2d Cir. 1991).  Unless a closed-end investment company voluntarily redeems its outstanding shares, investors in a closed-end fund must resell their shares in a secondary market.  *Id.*

[5]    The Form N-2/A Registration Statement filed September 12, 2007 consists in part of the form of prospectus for the ARPS offering as it existed prior to the issuance and filing of the definitive Prospectus.  It is unclear from the Complaint whether Plaintiff contends that the Registration Statement was rendered false and misleading as a result of misstatements purportedly made in the form of prospectus filed with the Form N-2/A on September 12, 2007, or whether the Complaint is directed only to the definitive Prospectus filed on September 17, 2007 (which, upon filing, became part of the Registration Statement).  This memorandum therefore will refer to both forms of the prospectus, which differ only in minor respects.  This memorandum will refer to disclosures contained in the prospectus incorporated in the Form N-2/A Registration Statement filed on September 12, 2007 by citation to the page number appearing in the upper right corner of the Form N-2/A Registration Statement (*e.g.*, "Ex. A at ___"), and to disclosures contained in the definitive Prospectus filed on September 17, 2007 by citation to the page number appearing in the upper right corner of that document (*e.g.*, "Ex. B at ___").

ARPS entitle their holders to receive cash dividends at rates that vary in successive dividend periods. (Compl. ¶ 5; Ex. A at 6; Ex. B at 4) At the time of issuance and distribution by the underwriter defendants, ARPS bore an initial dividend rate specified in the Prospectus. (Ex. A. at 26; Ex. B at 24) Thereafter, dividend rates for each respective ARPS series were set at auction for dividend periods generally seven days in duration. (Compl. ¶ 5; Ex. A at 6; Ex. B at 4) In summary, the auction process works as follows. Participants in the auction who wish to purchase ARPS from existing ARPS shareholders bid for a maximum amount of ARPS at the minimum dividend rate acceptable to them. (Compl. ¶ 5) If there are bids sufficient to cover all the shares up for auction, the auction succeeds. If there are varying rates bid at an auction, the "clearing rate" for the auction (*i.e.*, the dividend rate for the auction that will apply to all ARPS in the same series) is the lowest dividend rate specified in submitted bids which would result in all ARPS available for purchase at the auction being held either by bidders or by existing holders who wish to retain their ARPS at the clearing rate. (Ex. A at 108-110; Ex. B. at 106-08; *cf.* Compl. ¶ 5) The dividend rate set at auction cannot, however, exceed a maximum dividend rate defined in the Prospectus. (Ex. A at 89; Ex. B at 87)

Auctions may fail if more ARPS are offered for sale than there are buyers for those shares. (Ex. A at 61; Ex. B at 59) Auction failures began to occur earlier this year, in February 2008, when there were insufficient bids to cover the ARPS offered for sale. (Compl. ¶ 6) When the auctions failed, the dividend was set at the maximum rate described in the Prospectus. (Ex. A at 110; Ex. B at 108)[6]

---

[6]    Although the Complaint characterizes the dividend rate applicable in the case of an auction default as "low" and a "penalty" rate (Compl. ¶¶ 30, 32), the Prospectus discloses that the rate actually was the *maximum* rate payable by the Fund, which could not be exceeded by the rate set at auction for any dividend period. (Ex. A at 28; Ex. B at 26) This is one of many

**B.     Plaintiff's Claims.**

The Complaint contains an assortment of allegations that the Registration Statement and Prospectus ostensibly omitted material facts or contained untrue statements of material fact. Plaintiff's formulation of these alleged misstatements is not consistent; what are described in paragraph 7 of the Complaint as the "true facts" allegedly omitted from the Registration Statement appear later in the Complaint cast in somewhat different form and are sometimes characterized as "inaccurate statement[s] of material fact" or as "materially false and/or misleading" statements rather than as omissions.  (Compl. ¶¶ 26, 28)  The allegations, however cast or re-cast in the Complaint, follow two themes: (1) that the Registration Statement and Prospectus assertedly failed to disclose adequately the risk that ARPS auctions might fail, and the consequences of such failure; and (2) that the Registration Statement and Prospectus failed to disclose that in the event of an auction failure, ARPS were subject to disadvantages which ostensibly made them less attractive investments than an alternative investment vehicle, municipal auction rate securities ("MARS").  Because Plaintiff's allegations are scattered across the Complaint, they are collected and summarized below:

**Allegations Regarding the Risk and Consequences of Auction Failures:**

1. That the Registration Statement and Prospectus failed to disclose the "true risk" of an auction failure, which (according to the Complaint) was likely because broker-dealers allegedly had been "stepping in and purchasing" ARPS "for a long time" to prevent auction failures and to maintain the "illusion of an efficient and liquid market for the ARPS" (Compl. ¶¶ 7(a); 28-29);

2. That a disclosure in the Registration Statement and Prospectus that investors "may" not be able to sell ARPS if an auction failed was misleading because investors assertedly would "definitely not be able" to sell their ARPS if an

---

instances in which the Registration Statement and Prospectus flatly contradict and negate the allegations of the Complaint.

auction failed, and should have been informed that they "would have no way of selling there [sic] securities" (Compl. ¶¶ 25-26; 31(a));

3. That the Registration Statement should have disclosed that investors in ARPS "were purchasing highly illiquid securities without being compensated for this illiquidity" (Compl. ¶¶ 30; 31(b));

4. That what the Complaint calls the "default interest [sic - "dividend"] rate" set as a consequence of a failed auction purportedly would cause the ARPS to "trade at a discount to their par value" if auctions began to fail. (Compl. ¶ 7(d))

**Allegations Regarding Asserted Disadvantages of an Investment in ARPS Compared to "Certain" Unidentified Municipal Auction Rate Securities:**

1. That the Registration Statement and Prospectus failed to disclose that what the Complaint calls the "default interest [sic - dividend] rate[ ]…is less than the interest rate paid" when auctions fail for "certain competing municipal auction rate securities ('MARS')" (Compl. ¶ 7(b); 30);

2. That the Registration Statement and Prospectus failed to disclose that ARPS "suffer from an additional disadvantage compared to MARS" because ARPS have no fixed maturity date and issuers purportedly have no incentive to redeem auction rate securities, while MARS "have a set due date…." [7] (Compl. ¶¶ 7(c); 32)

The Complaint also contains allegations to the effect that ARPS assertedly were marketed as "short-term investments" and "cash equivalents." (Compl. ¶¶ 4; 31(a))  There is, however, no allegation that any such representation was made in either the Registration Statement or Prospectus.[8]  Consequently those allegations do not and cannot serve to support Plaintiff's Section 11 and Section 12(a)(2) claims, which are based solely upon asserted misstatements in the Registration Statement and Prospectus, and should be disregarded.

---

[7]     This is another way of saying that ARPS -- Auction Rate Cumulative *Preferred Shares* -- are preferred stock (and hence have no maturity or "due date"), while municipal auction rate securities necessarily are debt securities, rather than stock, and therefore have maturity dates.

[8]     Nor does the Complaint otherwise attempt to attribute any such representation to the defendants.  It contains no allegation as to the identity of any person making such a representation -- or even that such a representation was made to the Plaintiff.

## ARGUMENT

### I.    Standards Governing the Fund's Rule 12(b)(6) Motion to Dismiss.

In considering a motion to dismiss under Rule 12(b)(6), a court must presume only that the well-pleaded *facts* set forth in a complaint are true.  The Court thus need not credit legal conclusions or unsupported conclusions of fact, <u>Nelson v. Nielsen Media Research, Inc.</u>, 207 F. Supp. 2d 300, 302 (S.D.N.Y. 2002), such as the boilerplate recital in the Complaint in this case that the Registration Statement and Prospectus were "false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein."  (Compl. ¶ 36; *see also* Compl. ¶ 45)

To survive a motion to dismiss, the "[f]actual allegations [of a complaint] must raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929, 940 (2007) (stating that the observation in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts...which would entitle him to relief," "has earned its retirement" and "is best forgotten").  The complaint must show that the entitlement to relief is plausible, not merely that there might exist some set of facts consistent with the allegations of the complaint that would entitle the plaintiff to relief.  <u>Bell Atl.</u>, 127 S. Ct. at 1965-66.  *See also* <u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-58 (2d Cir. 2007) (<u>Bell Atlantic</u> obligates a pleader to "amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible").

Unlike Rule 9(b) of the Federal Rules of Civil Procedure, the <u>Bell Atlantic</u> standard is not limited to claims sounding in fraud.  It has been applied repeatedly by the courts in assessing the sufficiency of claims pleaded under Sections 11 and 12 of the 1933 Act.  *See, e.g.* <u>Grand Lodge</u>

of Pa. v. Peters, 550 F. Supp. 2d 1363, 1376 (M.D. Fla. 2008) (applying <u>Bell Atlantic</u> to Section 11 claim, and quoting that decision, at 127 S. Ct. at 1968, for the proposition that a complaint should not withstand dismissal based on the "possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery"); <u>Gotham Holdings, L.P. v. Health Grades, Inc.</u>, 534 F.Supp. 2d 442, 444 (S.D.N.Y. 2008) (*citing* <u>Bell Atlantic</u> on motion to dismiss Section 12(a)(2) claim).

Moreover, the heightened pleading standard of Rule 9(b) applies to claims under Sections 11 and 12 of the Securities Act of 1933 where such claims sound in fraud, and this is the case even though the allegations of a complaint are not "styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  *See* <u>Rombach v. Chang</u>, 355 F.3d 164, 171 (2d Cir. 2004) (holding that "the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud," and concluding that plaintiffs' Section 11 claims against certain defendants sounded in fraud where the complaint alleged that a registration statement was "inaccurate and misleading," contained "untrue statements of material facts," and that "materially false and misleading written statements were issued"); <u>In re AXIS Capital Holdings Ltd. Sec. Litig.</u>, 456 F. Supp. 2d 576, 597 (S.D.N.Y. 2006) (heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims where such claims are premised on allegations of fraud); <u>In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig.</u>, 434 F. Supp. 2d 233, 239 (S.D.N.Y. 2006) (holding that "[w]hen a claim under Section 12(a)(2) [of the] Securities Act is 'premised on averments of fraud,' the heightened pleading requirements of Rule 9(b) apply," and concluding that allegations that defendants "failed to disclose" and "omitted" certain facts sounded in fraud); <u>In re JP Morgan Chase Sec. Litig.</u>, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("plaintiffs must comply with the

pleading requirements of Fed. R. Civ. P. 9(b) when alleging violations of Section 11 that sound in fraud").

Like the complaint in <u>Rombach</u>, the "wording and imputations" of the Complaint in the instant case "are classically associated with fraud...."  Thus the Complaint alleges that the Registration Statement "contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading" (Compl. ¶ 24; *see also id.*, ¶ 36); that the Prospectus "contained untrue statements of material fact, and concealed and failed to disclose material facts" (Compl. ¶ 45); and that the Registration Statement and Prospectus contained "materially false and/or misleading" statements.  (*Id.* ¶ 26)  The sufficiency of the allegations of the Complaint therefore must be judged against the heightened pleading standard of Rule 9(b) which requires, among other things, that a complaint "explain why the statements were fraudulent."  <u>Rombach</u>, 353 F.3d at 170 (quoting <u>Mills v. Polar Molecular Corp</u>., 12 F.3d 1170, 1175 (2d Cir. 1993)).[9]

Finally, in ruling on a motion to dismiss, a court may consider documents attached to, incorporated by reference, or otherwise integral to the complaint, or which are subject to judicial

---

[9]     One of the counts in the Complaint, Count II, attempts to avoid application of Rule 9(b) by the expedient of disclaiming any intention to assert a fraud claim.  (Compl. ¶ 43)  Such statements are unavailing, however, where (as here), the substance of the allegations of the complaint sounds in fraud.  *See* <u>In re AXIS  Capital Holdings Ltd. Sec. Litig</u>., 456 F. Supp. 2d at 598 (plaintiffs' assertion that Section 11 and Section 12 claims were "not based on and do[ ] not sound in fraud" was not sufficient to preclude application of Rule 9(b) where the complaint was "rife with allegations of fraud" against certain defendants); <u>In re Merrill Lynch Inv. Mgmt. Funds Sec. Litig</u>., 434 F. Supp 2d at 239 (plaintiffs' statement that they "expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless conduct" was "unavailing" where plaintiffs' allegations sounded in fraud); <u>In re JP Morgan Chase Sec. Litig</u>., 363 F. Supp. 2d at 635 (where "entire complaint sound[ed] in fraud," court concluded that "[d]espite [plaintiffs'] disclaimer of any claim of fraud with respect to the Section 11 claim, the heightened pleading standards of Fed R. Civ. P. 9(b) apply"); <u>In re Elan Corp. Sec. Litig</u>., No. 02 Civ. 865, 2004 U.S. Dist. LEXIS 9913, at *23 (S.D.N.Y. May 18, 2004) (pleading requirements of Rule 9(b) applied where "[n]otwithstanding the Plaintiffs' fraud disclaimer," plaintiffs' Section 11 claims were "peppered" with statements associated with fraud).

notice, and doing so does not convert a motion to dismiss into one for summary judgment. Thomas v. Westchester County Health Care Corp., 232 F. Supp. 2d 273, 275-76 (S.D.N.Y. 2002). *See also* Harrison v. Rubenstein, No. 02 Civ. 9356, 2007 U.S. Dist. LEXIS 13118, at *27-28 (S.D.N.Y. Feb. 23, 2007) (court may consider "public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit") (*quoting* Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000)).   Thus, in this case the Court may and should consider the allegations of the Complaint together with the Registration Statement and Prospectus referred to and quoted in that pleading.  I. Meyer Pincus, 936 F.2d at 762.  It is of no consequence that the Complaint does not attach the Registration Statement or Prospectus, or that it fails to expressly incorporate those documents by reference; the Second Circuit has declined "to close…[the courts'] eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the Complaint or to incorporate it by reference." *Id.*  It is enough that the Registration Statement and Prospectus are integral to the Complaint, as is necessarily the case here where "the claims pleaded...are based *only* on an alleged written misrepresentation appearing" in those documents, and no allegation is made against defendants "stemming from any other source [attributable to the defendants], such as words, conduct, or other documentation." *Id.*

## II.    Plaintiff's Allegations Concerning the Auction Process Fail to State a Claim Under Section 11 or Section 12(2)(a) of the 1933 Act

One of the first things that appears from a review of the allegations of the Complaint asserting deficiencies in the disclosures concerning the ARPS auction process is that those allegations are internally inconsistent.  For example, on one hand the Complaint alleges that the

Registration Statement and Prospectus were misleading because they failed to state that if the auction process failed, investors would "*definitely* not be able to sell...[their]...ARPS." (Compl. ¶ 26; emphasis added) On the other, it alleges that "if and when auctions began to fail," ARPS would "*trade* at a discount." (Compl. ¶ 7(d); emphasis added) Similarly, the Complaint alleges that the auctions "were not *bona fide* auctions at all," but rather were "a mechanism to maintain the illusion of an efficient liquid market for ARPS" which "had been going on for a very long time." (Compl. ¶ 7(a)) At the same time, the Complaint acknowledges that ARPS were first offered to the public pursuant to the Registration Statement and Prospectus filed in September 2007 (Compl. ¶ 23), and the claims in this case are based upon purported deficiencies in that Registration Statement and Prospectus. How is it that the Registration Statement and Prospectus should have -- or *could* have -- disclosed that an "illusion of an efficient market for ARPS" had been maintained "for a very long time" when the ARPS were not issued, much less traded at auction, until *after* the Registration Statement and Prospectus were published? The Complaint offers no explanation.[10]

These inconsistencies in the Complaint suggest that this lawsuit was filed with an eagerness unrestrained by attention to detail. A comparison of the allegations of the Complaint to the disclosures contained in the Registration Statement and Prospectus suggests worse -- that the Complaint was filed in disregard of the contents of those documents.

---

[10] Plaintiff may contend that the allegation that the auction market had been illusory "for a very long time" necessarily was not made in reference to ARPS, but rather was made in reference to *other* auction rate securities having nothing to do with the ARPS. That may be so, but if it is, it serves only to underscore the insufficiency of the Complaint to state a claim as to the Fund's ARPS offering, and the absence of allegations raising "a right to relief above the speculative level." Bell Atl., 127 S. Ct. at 1965.

**A.    The Disclosures in the Registration Statement and Prospectus Negate the Allegations of the Complaint and "Bespeak Caution" Regarding the Risk and Consequences of Auction Failure.**

"The test for whether a statement is materially misleading within the meaning of section 11 is not whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the investment."  Pew v. Cardarelli, No. 5:03-CV-742, 2005 U.S. Dist. LEXIS 40018, at *11 (N.D.N.Y. March 17, 2005) (*citing* Rombach v. Chang, 355 F.3d 164, 178, n.11 (2d Cir. 2004)); *see also* Sedighim v. Donaldson, Lufkin & Jenrette, Inc., 167 F. Supp. 2d 639, 647-50 (S.D.N.Y. 2001) (dismissing Section 11 and Section 12(a)(2) claims because disclosures in a prospectus were such that it was not misleading in any way).  The courts have routinely dismissed Section 11 and Section 12(a)(2) claims "if they charge omission of what was in fact disclosed."  Demaria v. Andersen, 153 F. Supp. 2d 300, 311 (S.D.N.Y. 2001) (*quoting* Hinerfeld v. United Auto Grp., No. 97 Civ. 3533, 1998 U.S. Dist. LEXIS 10601, at *13 (S.D.N.Y. July 15, 1998) (internal quotation marks omitted)).  Mere allegations of misstatements or omissions do not control when those allegations conflict with the plain language of a registration statement or prospectus.  In such a case, the registration statement or prospectus controls, and the court will reject the allegations in the complaint.  Demaria, 153 F. Supp. 2d at 306.

Moreover, under the "bespeaks caution" doctrine there can be no liability under Sections 11 or 12(a)(2) where allegedly misleading statements, prospective in nature, are "sufficiently balanced by cautionary language within the same [offering material] such that no reasonable investor would be misled about the nature and risk of the offered security."  P. Stolz Family P'ship L.P. v. Daum, 355 F.3d at 92, 96 (2d Cir. 2004)  (allegations that defendant company failed to disclose that an investment bank retained by the company had failed to raise funds, and

that company was essentially insolvent and was being supported by sales of membership interests rather than revenue from operations, were prospective in nature, and were neutralized by statements cautioning prospective investors that future financing was tenuous); I. Meyer Pincus, 936 F 2d at 763 (affirming dismissal of Section 11 claim due to applicability of bespeaks caution doctrine).

Cautionary language is sufficient under the bespeaks caution doctrine if it identifies the risk that the plaintiff alleges led to his or her loss.  P. Stolz Family P'ship, 355 F. 3d at 96.  *See also* Havsy v. Just Toys, Inc., No. 93 Civ. 8077, 1994 U.S. Dist. LEXIS 9882, at *10 (S.D.N.Y. July 20, 1994) (bespeaks caution doctrine applies "where the totality of statements is generally cautious, and projections are tempered by warnings of risks").  Dismissal is appropriate where the allegations of the complaint and a defendant's offering materials demonstrate that the doctrine applies.   Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd., 383 F. Supp. 2d 428, 459 (S.D.N.Y. 2003) ("Courts in this District have applied the 'bespeaks caution' doctrine at the pleading stage to dismiss securities fraud claims"); Luce v. Edelstein, 802 F. 2d 49, 56 (2d Cir. 1986) (bespeaks caution doctrine applied to forward-looking statements in offering memorandum where memorandum made clear that benefits of investment were speculative and that actual results could vary materially from predictions); I. Meyer Pincus, 936 F. 2d at 763 (bespeaks caution doctrine applied to statements that prices at which shares trade are subject to a variety of general market and economic conditions); Havsy, 1994 U.S. Dist. LEXIS 9882, at *6-10 (prospectus adequately warned investors of potential manufacturing and other risks).

As the discussion below demonstrates, in this case the disclosures in the Registration Statement and Prospectus affirmatively *negate* the misrepresentations and omissions alleged in

the Complaint. In addition, the allegations in the Complaint asserting inadequacies in the Registration Statement and Prospectus are directed to disclosures that are prospective in nature, in that they relate to the risk of the occurrence of future events. These include the risk (the significant "likelihood," according to Paragraph 28 of the Complaint) of ARPS auction failure; the risk that in the event of auction failure, purchasers of ARPS would not be able to sell their ARPS (a risk that Paragraph 26 of the Complaint describes as "definite[ ]"); and the risk that what the Complaint calls the "default interest rate" triggered by an auction failure would "cause the ARPS to trade at a discount to their par value." (Compl. ¶ 7(d)) Because each of these alleged misrepresentations or omissions goes to disclosures prospective in nature, each is subject to the "bespeaks caution" doctrine. P. Stolz Family P'ship L.P., 355 F.3d at 97. And here, in light of those disclosures, no reasonable investor could have been misled as to the nature of an investment in ARPS.

**B.      The Registration Statement and Prospectus Are Replete With Disclosures and Cautionary Statements Regarding the Risk of Auction Failure and the Consequences of Such a Failure.**

The "Risk Factors" section in the Prospectus begins by stating that risk is "inherent" in all investments,[11] and that investors may receive "little or no return" on their investment. (Ex. A at 22, 61; Ex. B at 20, 59) Following this admonition, the offering documents contain a series of disclosures concerning specific risk factors -- including the risks Plaintiff contends were not disclosed in the Registration Statement and Prospectus. *Id.*

---

[11]     This initial disclosure of "*investment*" risk, standing alone, would negate any allegation that the Registration Statement and Prospectus somehow "misrepresented, marketed and sold" ARPS as cash or cash equivalents -- if the Complaint could be construed to make such an allegation against the defendants.

1.      **Disclosures Concerning the Risk of Auction Failure.**

Plaintiff contends that the Registration Statement and Prospectus were deficient because they failed to disclose the "likelihood" of an auction failure.  (Compl. ¶ 27)  This allegation is defective from the outset in that it *assumes* that auction failure was "likely," if not foreordained, without pleading an adequate factual basis for this critical assumption; Plaintiff's logic appears to be that since the auction process failed in *February 2008*, that failure *must* have been inevitable as of *September 2007*.  This is pleading by hindsight, and it runs afoul not only of Rule 9(b), but of the Supreme Court's admonitions that a complaint must raise "a right to relief above the speculative level" and must set forth allegations plausibly suggesting, not merely consistent with, a necessary element of the plaintiff's claim.  Bell Atl., 127 S. Ct. at 1965-66.[12]  It also contravenes the express limitation of Section 11 to false statements or misleading omissions of material fact in any part of a registration statement "*when such part became effective*."  15 U.S.C. § 77k(a)  (Emphasis added)

Beyond this, the Registration Statement and Prospectus disclosed the risk of auction failure in intense detail.  The Complaint acknowledges (Compl. ¶ 27) that the Prospectus contained the following disclosure concerning variables that could affect interest in the purchase and sale of ARPS, and therefore the reliability of the auction process:

---

[12]      Plaintiff's Complaint does, to be sure, allege that the auctions "were not real auctions" (Compl. ¶ 28), and portrayed only "the illusion of an efficient market" (Compl. ¶ 29), but those allegations are themselves conclusions.  What is the support for those conclusions?  The Complaint alleges that "[f]or a long time the broker-dealers running the auctions had prevented auction failures by stepping in and purchasing the ARPS" (Compl. ¶ 28), but an allegation that broker-dealers had been conducting and participating in auctions "for a long time" provides no basis for an inference that they would *cease* participating.  Moreover, as discussed *supra* at p. 12, this allegation is inconsistent with and negated by other allegations in the Complaint that demonstrate that the ARPS were first issued in September 2007 and *therefore could not have been traded* at auction or otherwise prior to the filing of the Registration Statement and Prospectus.

- "The relative buying and selling interest of market participants in your Preferred Shares and in the auction rate securities market as a whole will vary over time, and such variations may be affected by, among other things, news relating to the Fund, the attractiveness of alternative investments, the perceived risk of owning the security (whether related to credit, liquidity or any other risk), the tax treatment accorded the instruments, the accounting treatment accorded Preferred Shares, including recent clarifications of U.S. generally accepted accounting principles relating to the treatment of auction rate securities, reactions to regulatory actions or press reports, financial reporting cycles and market sentiment generally.    Shifts of demand in response to any one or simultaneous particular events cannot be predicted and may be short-lived or exist for longer periods."

    Ex. A at 61; Ex. B at 59.

In addition to this listing of factors that could impact the market for ARPS, the Registration Statement and Prospectus contained a series of disclosures addressing the specific risk that auctions might fail due to the absence of bidders and broker-dealer participation. First, the Prospectus made it unequivocally clear that an investor's ability to resell ARPS was limited. For example:

- "The Preferred Shares will not be listed on an exchange."

    Ex. A at 24, Ex. B at 22.

- "An Existing Owner may sell, transfer or dispose of the Preferred Shares (i) in an auction for the Preferred Shares, only pursuant to a bid or sell order in accordance with the auction procedures or (ii) outside an auction for the Preferred Shares, only to or through a Broker-Dealer."

    Ex. A at 117; Ex. B at 115.

- "[I]f you try to sell your Preferred Shares between auctions you may not be able to sell any or all of your shares.…"

    Ex. A at 22; Ex. B at 20.

Second, the Prospectus made very clear that broker-dealers *could* submit bids to prevent an auction failure, but that they were under no *obligation* to do so:

- "A Broker Dealer may submit orders in auctions for its own account….*A Broker-Dealer may also bid in order to prevent what would otherwise be a failed auction, or an auction clearing at a rate that the Broker-Dealer believes does not reflect the market for such securities at the time of the auction*."

  Ex. A at 61; Ex. B at 59.  (Emphasis added)

- "[T]he fact that an auction for the Preferred Shares clears successfully does not mean that an investment in the Preferred Shares involves no significant liquidity or credit risk.  *A Broker-Dealer is not obligated to continue to place such bids or to continue to encourage other bidders to do so in any particular auction for the Preferred Shares to prevent an auction failure*…"

  Ex. A at 113; Ex. B at 111.  (Emphasis added)

- "A Broker-Dealer may submit a bid in an auction for the Preferred Shares to avoid an auction failure, but it is not obligated to do so."

  Ex. A at 117; Ex. B at 115.

Third, it was expressly disclosed that in the absence of sufficient bidders or broker-dealer participation, auction failures could occur:

- "[If] there are more Preferred shares offered for sale than there are buyers for those Preferred Shares in any auction, *the auction will fail* and you may not be able to sell some or all of your Preferred Shares at that time."

  Ex. A, p. 61; Ex. B, p. 59.

- "*There may not always be enough bidders to prevent an auction from failure in the absence of a Broker-Dealer bidding in the auction for its own account or encouraging others to bid*. Therefore, *auction failures are possible*, especially if the Fund's credit were to deteriorate, a market disruption were to occur or *if, for any reason, a Broker-Dealer were unable or unwilling to bid*."

  Ex. A, p. 117; Ex. B, p. 115.  (Emphasis added)

Thus, the Registration Statement and Prospectus thoroughly described the risk of auction failure, and the circumstances under which such failure could occur.  Nothing more is required by Section 11 or Section 12(a)(2).

18

2.       **Disclosures Concerning the Consequences of Auction Failures.**

The Complaint alleges that an assertedly undisclosed consequence of auction failure was the inability of an investor to sell his or her ARPS, *i.e.*, a lack of liquidity. (Compl. ¶¶ 25-26) The Registration Statement and Prospectus, however, specifically disclosed that auction failure could result in an inability to sell some or all of an investor's shares:

- "You may only buy or sell Preferred Shares through an order placed at auction with or through a broker-dealer...or in a secondary market maintained by certain broker-dealers. These broker-dealers are not required to maintain this market, and it ***may not provide you with liquidity***."

   Ex. A, at 6; Ex. B at 4. (Emphasis added)

- "In addition to the auctions...broker-dealers may maintain a secondary trading market in Preferred Shares outside of auctions, but may discontinue this activity at any time. There is no assurance that a secondary market will be created or, if created, that it will provide shareholders with liquidity or that the trading price in any secondary market would be $25,000."

   Ex. A at 24-26; Ex. B at 22-24.

- "**Auction Risk.** You may not be able to sell your Preferred Shares at an auction if the auction fails; that is, if there are more Preferred Shares offered for sale than there are buyers for those shares...."

   Ex. A at 61; Ex. B at 59.

   "Existing Owners will be able to sell all of the Preferred Shares that are the subject of their submitted sell orders only if there are bidders willing to purchase all those Preferred Shares in the auction for the Preferred Shares. ***If sufficient clearing bids have not been made, Existing Owners that have submitted sell orders will not be able to sell in the auction for the Preferred Shares all, and may not be able to sell any, of the Preferred Shares subject to such submitted sell orders.***"

   Ex. A at 117; Ex. B at 115. (Emphasis added)[13]

---

[13]     These disclosures also serve to negate any contention that the Registration Statement and Prospectus were misleading for an asserted failure to disclose that investors supposedly "were receiving little or no premium" or were not "compensated" for the risk of illiquidity. The risk of

Plaintiff suggests that these disclosures do not go far enough -- that the Fund should have stated without qualification that an investor "will definitely not be able to [sic - "liquidate"] his ARPS if the auction fails."  (Compl. ¶ 26)  Such a disclosure would have been false, however, (1) because a single auction failure does not dictate that all subsequent auctions will fail, (2) because of the possibility that an investor might be able to sell his or her shares to or through a broker (Ex. A at 111; Ex. B at 109), and (3) because ARPS are subject to redemption (that is, repurchase) by the Fund.  With regard to redemption, the Registration Statement and Prospectus state:

- "The Preferred Shares are redeemable, in whole or in part, at the option of the Fund on the second business day prior to any date dividends are paid on the Preferred Shares, and will be subject to mandatory redemption in certain circumstances at a redemption price of $25,000 per share, plus accumulated, unpaid dividends to the date of redemption, plus a premium in certain circumstances."

  Ex. A at 6; Ex. B at 4.

- "[T]he Fund may be forced to redeem your shares to meet regulatory or rating agency requirements or may voluntarily redeem your shares in certain circumstances at a time when it is not advantageous to you…."

  Ex. A at 24; Ex. B at 22.

- "The Fund may redeem Preferred Shares voluntarily under certain conditions."

  Ex. A at 30; Ex. B at 28.

Thus, redemption of ARPS by the Fund was, and is, another means by which an investment in ARPS might be liquidated notwithstanding the occurrence of an auction failure.[14]

---

illiquidity was squarely disclosed, as were the initial dividend rate, and the maximum dividend rate payable at auction or in the event of an auction default.

[14]    And in fact, that is precisely what has happened.  On May 5, 2008, the Fund filed a Notice of Intention to Redeem Securities with the SEC, reflecting the Fund's intention to redeem all but 2,000 of the 14,000 ARPS issued in September 2007.  The Notice of Intention appears on the SEC's website at

The Complaint also alleges that the Registration Statement and Prospectus failed to disclose that if auctions failed, the "default interest rate" triggered by a failed auction would cause ARPS to trade at a discount to their par value.[15] (Compl. ¶ 7(d))  To the contrary, the "Risk Factors Summary" in the Prospectus warned:

- "[B]ecause of the nature of the market for Preferred Shares, you may receive less than the price you paid for your shares if you sell them outside of the auction, especially when market interest rates are rising…."

    Ex. A at 22; Ex. B at 20.

The Prospectus went on to again warn investors that ARPS could trade below par value:

- "Each Broker-Dealer, in its own discretion, may decide to buy or sell the Preferred Shares in the secondary market for its own account from or to investors at any time and at any price, *including at prices equivalent to, below, or above par for the Preferred Shares*. However, a Broker-Dealer is not obligated to make a market in the Preferred Shares and may discontinue trading in the Preferred Shares without notice for any reason at any time. *Existing Owners who resell between auctions for the Preferred Shares may receive an amount less than par, depending on market conditions.*"

    Ex. A at 117; Ex. B at 115.  (Emphasis added)

- "If you try to sell your Preferred Shares between auctions, you may not be able to sell any or all of your shares, *or you may not be able to sell them for $25,000 per share or $25,000 per share plus accumulated dividends*."

---

http://www.sec.gov/Archives/edgar/data/1396277/000091384908000220/n23c2_050208.htm. Because Plaintiff has not sought to file an amended complaint that might contain allegations indicating whether plaintiff's ARPS have been redeemed in whole or in part, the status of Mr. Miller's ARPS investment is uncertain at this time.  Consequently, the Fund is not raising redemption as a ground for dismissal at this time.

[15]    Notwithstanding this allegation, the Complaint nowhere alleges that what it calls the "default interest rate" applicable in the event of auction failure was lower than the rate set at auction, much less lower than the appropriate market rate.  Nor could it do so.  *See* the discussion *supra*, at p. 5.

Ex. A at 63; Ex. B at 61.  (Emphasis added)

These explicit disclosures in the Registration Statement and Prospectus do more than merely *caution* investors of the risks that Plaintiff contends were concealed; collectively they affirmatively *negate* the allegations of the Complaint.  In similar circumstances, the courts have dismissed Section 11 and Section 12(a)(2) claims.  <u>I. Meyer Pincus</u>, 936 F. 2d at 761-62 (statement that shares of closed-end investment companies "frequently trade at a discount from or premium," and that shares of subject company also were "expected to trade at a discount or premium" was not misleading for failure to state that such shares *usually* trade at a discount; disclosure in prospectus was "remarkably direct"); <u>Demaria</u>, 153 F. Supp. at 311 (Section 11 claims dismissed where the "Prospectus made substantial disclosure with respect to the precise omissions that undergird plaintiffs' claim").

The disclosures in the Registration Statement and Prospectus issued by the Fund were "remarkably direct," and could not have misled any reasonable investor.  The Section 11 and 12(a)(2) claims in the Complaint concerning the risk and consequences of auction failure should therefore be dismissed.

## III.    The Fund Had No Duty to Compare ARPS to Other Investment Options.

The offering materials addressed the fact that the market value of the ARPS could depend upon the attractiveness of alternative investments:

> "[T]he auction rate on any Preferred Shares purchased or retained in the auction for the Preferred Shares may be lower than the market rate for similar investments."

> Ex. A at 115; Ex. B at 113.

> "The ability to resell the Preferred Shares will depend on various factors affecting the market for the Preferred Shares, including news relating to the Fund, *the attractiveness of alternative investments*, investor demand for short-term securities, the perceived risk of owning the Preferred Shares (whether related to credit, liquidity or any other risk), the tax or

> accounting treatment accorded the Preferred Shares (including U.S. generally accepted accounting principles as they apply to the accounting treatment of auction rate securities), reactions of market participants to regulatory actions (such as those described in 'Securities and Exchange Commission Settlements' below) or press reports, financial reporting cycles and market conditions generally. Demand for the Preferred Shares may change without warning, and declines in demand may be short-lived or continue for longer periods."

Ex. A at 117; Ex. B at 115.  (Emphasis added)

Not content with these disclosures, Mr. Miller purports to assert claims under Section 11 and Section 12(a)(2) for failure to disclose that in the event of auction default, ARPS purportedly were subject to certain asserted disadvantages as compared to an investment in auction rate municipal securities.  More specifically, Plaintiff contends that the Registration Statement and Prospectus should have disclosed that the ARPS dividend rate applicable in the event of an auction default was less than the interest rate paid when auctions for "certain" unidentified MARS failed, and that unlike MARS, which "have a set due date," auction rate securities have no fixed maturity date.  (Compl. ¶¶ 7(b); 7(c); 30; 32).  These claims fail as a matter of law for the simple reason that the Fund had no duty to make such investment comparisons.

To state a claim under Sections 11 or 12(a)(2) for the omission of material information, a defendant must have been under a legal obligation to disclose the allegedly omitted information. In re Merrill Lynch Inv. Mgmt. Fund Sec. Litig., 434 F. Supp. 2d at 237.  An issuer of securities has no duty to serve as an investment adviser to prospective purchasers, rendering advice to the general public as to investment alternatives and the best use of investment dollars. *See, e.g.* J & R Marketing, SEP v. Gen. Motors Corp., 519 F. 3d 552, 561 (6th Cir. 2008).  The court in J & R Marketing dismissed Section 11 and 12(a)(2) claims that the credit rating and coupon rate set forth in registration statements and prospectuses for multiple bond offerings by General Motors Acceptance Corporation ("GMAC") were materially misleading because they failed to disclose

information pertaining to the performance of General Motors Corporation ("GM") which would have adversely affected GMAC's credit rating and risk of default.  The Court reasoned that:

> "The coupon rate on the bond was not misleading…The coupon rate was in fact true – it accurately stated the amount of interest that GMAC would be paying on the bonds.  GMAC never went further and stated that the coupon rate was the fairest rate of interest for it to pay investors or that it somehow reflected GMAC's entire risk of default.  A reasonable investor reads the coupon rate and takes from it that GMAC was willing to pay a certain rate of interest on its bonds.  A reasonable investor would then investigate whether or not she or he was willing to accept that rate of interest for the investment, not assume, absent a statement to the contrary, that GMAC had incorporated all material information into its determination of the coupon rate and rely solely on that."

*Id.* at 561.

Similarly, in <u>In re Donald J. Trump Casino Sec. Litig.</u>, the Third Circuit concluded that the failure of a prospectus to compare an issuer's debt-equity ratio with that of its competitors did not create an actionable claim under Sections 11 and 12 of the Securities Act or Section 10 of the Securities Exchange Act.  7 F.3d 357, 375 (3d Cir. 1993).  The Court reasoned,

> "The federal securities laws do not ordain that the issuer of a security compare itself in myriad ways to its competitors, whether favorably or unfavorably, for at least three reasons.  First, such a requirement would impose an onerous if not insurmountable obstacle on issuers of securities to ensure they obtain accurate information on all aspects of their competitors which a reasonable investor might find material.  Second, were we to announce such a requirement, the likely result would be to inundate the investor with what the Supreme Court disparaged as 'an avalanche of trivial information.'  Third – and of greatest consequence – it is precisely and uniquely the function of the *investor, not* the issuer of securities, to make such comparisons among investments."

<u>In re Trump Casino Sec. Litig.</u>, 7 F.3d at 375-76.

In <u>Benzon v. Morgan Stanley</u>, plaintiffs alleged that defendant's prospectus was misleading in violation of § 12 of the Securities Act and SEC Rule 10b-5 in that it failed to adequately disclose that certain classes of issued shares were superior to another class.  420 F.3d 598, 606

(6th Cir. 2005). Plaintiffs argued that the prospectus should have disclosed "certain specific facts about the holding periods and investment amounts with respect to which different share classes will perform best." Benzon, 420 F.3d at 607. Affirming the district court, the Sixth Circuit held that "federal securities law does not require Defendants to make statements of the type suggested by Plaintiffs regarding the relative merits of different class shares." *Id.* at 608. The Court concluded that "all of the information necessary to compare the different class shares was in the prospectuses." *Id.* at 609. While the statements proposed by the plaintiffs might have facilitated an investor's comparison of the share classes, such statements were "merely interpretations drawn from the facts presented in the prospectuses, and [did] not actually provide new information." *Id.* Accordingly, inclusion of those statements would not have significantly altered the total mix of information presented in the prospectuses. *Id.*

Here, the Prospectus disclosed the maximum dividend rate payable on the Fund's ARPS in the event of an auction default (what Plaintiff refers to as the "default interest rate"), as well as the method by which that dividend rate would be determined. (Ex. A at 28, 89; Ex. B at 26, 87) Armed with that information, investors were fully capable of deciding for themselves whether that maximum dividend rate -- and all the other features of an investment in ARPS[16] -- rendered ARPS a more or less desirable investment than one in "certain" municipal auction rate securities left unidentified in the Complaint (Compl. ¶ 7(b)), or in any other investment vehicle. As the authorities discussed above indicate, the federal securities laws did not require the Fund to draw those comparisons for investors, nor was the Fund required to provide investors with the interest

---

[16]    The same is true of Plaintiff's allegation that the Fund should have disclosed that ARPS "exist in perpetuity until such time as the Fund calls them due, while MARS have a set due date...." (Compl. ¶ 7(c)) The Prospectus unequivocally disclosed the nature of an investment in ARPS as an equity investment, not a debt obligation (such as a bond) with a "due date." Moreover, the Prospectus also disclosed that ARPS were subject to redemption by the Fund at par value (Ex. A at 6; Ex. B at 4), and hence were not "perpetual."

or dividend rates paid by other investment instruments.  *See* In re Progress Energy, Inc. Sec. Litig., 371 F. Supp. 2d 548, 552-53 (S.D.N.Y. 2005) ("It is well-established law that the securities laws do not require disclosure of information that is publicly known").  Consequently, the Complaint fails to state a claim upon which relief could be granted under Section 11 or Section 12(a)(2) based upon a failure to compare the respective merits of an investment in ARPS and an investment in MARS.

## IV.    Plaintiff Lacks Standing to Assert A Claim Under Section 12(a)(2).

Section 12(a)(2) provides, in material part, that any person who offers or sells a security by means of a prospectus containing an untrue statement of material fact, or which omits a material fact necessary to make statements made in the prospectus not misleading:

> "shall be liable...to ***the person purchasing such security from him***, who may sue either at law or in equity...to recover the consideration paid for such security, with interest thereon, less the amount of any income received thereon, upon tender of such security, or for damages if he no longer owns the security."

15 U.S.C. §77l(a)(2) (Emphasis added)  This section has been construed to mean that only purchasers in an initial public offering have standing to assert a claim under Section 12(a)(2), and that purchasers in private or secondary transactions lack standing to sue under that section. *See, e.g.,* Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 578 (1995) (the "intent of Congress and the design of the statute require that § 12(2) liability be limited to public offerings"); In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2005) (dismissing Section 12(a)(2) claim against issuer, its officers, directors, and underwriters of initial public offering both because plaintiffs had failed to allege facts sufficient to show that a prospectus was misleading and because plaintiffs lacked standing under Section 12(a)(2) since they failed to allege that they had purchased in the initial public offering); Saslaw v. Al Askari, No. 95 Civ. 7641, 1997 U.S. Dist. LEXIS 5621, at *18 (S.D.N.Y. April 23, 1997) (investors who purchased corporate notes from

broker seven months after issuance of notes by corporate defendant lacked standing to sue issuer under Section 12(a)(2) since plaintiffs had acquired their notes in a secondary market transaction).

In this case, the Certification of Sheldon Miller attached to the Complaint states that Mr. Miller "executed the following transactions in the securities of Calamos Global Dynamic Income Fund.  See Attachment A:"  Attachment A, which appears immediately below Mr. Miller's signature, indicates that he acquired one ARPS on December 18, 2007 -- well *after* the initial public offering for the shares covered by the Prospectus.[17]  Absent an allegation in the Complaint that the Fund issued additional ARPS subsequent to that initial public offering, Plaintiff could not have purchased his share from the Fund.  Consequently, Mr. Miller lacks standing to sue the Fund under Section 12(a)(2).  In re Cosi, *supra*; Saslaw, *supra*; *Cf*. Grand Lodge of Pa. v. Peters, 550 F. Supp. 2d 1363, 1376 (M.D. Fla. 2008) (dismissing Section 11 claim where complaint failed to demonstrate plaintiff's standing by alleging facts, as opposed to mere conclusion that stock was "traceable to" registration statement and prospectus).

## CONCLUSION

For the foregoing reasons, defendant Calamos Global Dynamic Income Fund respectfully requests that the Court dismiss the Complaint filed by Plaintiff Sheldon Miller, and that the Fund be awarded its costs of suit, including its reasonable attorneys' fees, pursuant to Section 11(e) of the 1993 Act, 15 U.S.C. § 77k (e).

---

[17]    The Complaint is otherwise silent as to the circumstances of Mr. Miller's purchase.

Date:  September 2, 2008

Respectfully submitted,

SCHULTE ROTH & ZABEL LLP


By:  /s/ Robert J. Ward_____
        Robert J. Ward
        919 Third Avenue
        New York, New York 10022
        Phone:  (212) 756-2000
        Fax: (212) 593-5955
        Email:  robert.ward@srz.com

John W. Rotunno
Kenneth E. Rechtoris
Jeffrey T. Petersen
Bell, Boyd & Lloyd LLP
70 West Madison Street, Suite 3100
Chicago, Illinois 60602-4207
Telephone:  (312) 372-1121
Fax: (312) 827-8000
E-mail:  jrotunno@bellboyd.com
        krechtoris@bellboyd.com
        jpetersen@bellboyd.com

   *Attorneys for defendant Calamos Global
   Dynamic Income Fund*